UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JODI BANASZAK,

        Plaintiff,                             Case No. 12-12433
                                                         Honorable Thomas L. Ludington

v.

TEN SIXTEEN RECOVERY NETWORK,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

To save her job, Jodi Banaszak needed to pick up the phone and make a call. She did not. As a result, her employer — Ten Sixteen Recovery Network (Ten Sixteen) — terminated her employment for violating its employee call-off policy. Banaszak alleges she was not fired because she took time off without sufficient explanation, but because she suffers from depression and anxiety. In her complaint, Banaszak alleges two claims based on her termination: (1) discrimination under the American with Disabilities Act (ADA); and (2) interference with rights under the Family Medical Leave Act (FMLA). Based on the following, Ten Sixteen's motion for summary judgment will be granted.

**I**

**A**

The relevant facts begin in July of 2006. Banaszak — employed by Bay Regional Medical Center at the time — applied for an office manager position with Ten Sixteen. Banaszak was earning $9.60 an hour with Bay Regional, and Ten Sixteen offered her a more lucrative $10.00 an hour. After Banaszak applied, she was granted an interview; after a strong

showing, she was hired for the position. Notably, Banaszak had never requested accommodations during her tenure with Bay Regional, and during the application process she did not inform Ten Sixteen that she suffered from any type of disability or impairment. Indeed, she testified that she "didn't suffer from any disabilities at that time." Banaszak Dep. 23, *attached as* Def.'s Mot. Ex. A.

In early 2009, Banaszak began feeling "[a] lot of sadness . . . lack of motivation and just not feeling like [herself] at all." *Id.* at 31. She also experienced "[l]ack of sleep, lack of appetite," and was "tearful" at times. *Id.* So, after consulting with her mother, Banaszak made an appointment with Dr. Michael Ingram, a board-certified psychiatrist.

Banaszak had her first (and only) appointment with Dr. Ingram in February 2009, and he prescribed Wellbutrin (a drug primarily used as an antidepressant). Banaszak testified that Dr. Ingram diagnosed her with "Major depression NOS . . . and anxiety." *Id.* at 43–44. After the first appointment, Banaszak's only other appointment was over "a year-and-a-half later" in November of 2010. *Id.* at 33–34. Notably, she did not see Dr. Ingram during the second appointment, but instead consulted with a nurse practitioner. *Id.* at 35. Aside from those two visits, Banaszak did not seek treatment for her mental health issues until the events that form the basis of this lawsuit.

Throughout her time with Ten Sixteen (July 2006 to June 2011), Banaszak never once provided documentation indicating she had been diagnosed with depression or anxiety; nor did she ask for accommodations of any kind.

**B**

Ten Sixteen utilizes an employee policy (the Policy) that governs, among other things, unexpected absences from work. *See* Ten Sixteen Personnel Policies, *attached as* Def.'s Mot.

Ex. B. The purpose of the unexpected absences section of the Policy "is to promote the efficient operation of all Ten Sixteen programs and minimize unscheduled absences, late arrivals, early departures, or other absences." *Id*. at 18. The Policy also includes a "call-off process":

> There are times when employees cannot come to work on short notice, or must leave work early on short notice. Although these situations do occur, they can be very disruptive to Ten Sixteen. Consequently, the process for calling-off is detailed below and the consequences for not following the procedures.
>
> **Definition of "call-off":**
>
> - A call-off is communication that an employee will not be able to fulfill their scheduled shift with less than 48 hours notice.
>
> \*   \*   \*   \*   \*
>
> - If an employee is sick and needs to be off for more than one day, this would count as one call-off. However, on the 3rd consecutive day of absence, a doctor's note is required in order for the 3rd day to be considered an approved absence.
>
> \*   \*   \*   \*   \*
>
> **Procedures to follow for an "approved call-off":**
>
> - The employee must talk directly to their manager or to someone the manager has specifically designated to communicate the absence.
>
> - If the employee's shift requires coverage during their absence, <u>the employee calling off is required to obtain the backup</u>. *If backup cannot be secured, the person on duty cannot leave until the shift is covered.*
>
> - The employee must make sure that key commitments or responsibilities are covered and/or are re-scheduled.
>
> - Once the employee returns to work, a Request for Time Off slip is filled out for the time missed and submitted to their manager. If the above procedures were followed appropriately, the time off will be approved and APL time can be used, if available, to cover the missed hours. If the above procedures were not followed correctly, the manager can deny approval for the time off. The absence will be considered unexcused, and the time off will be unpaid. It will be the

>>final decision of the manager as to whether the time off is approved or unexcused.

*Id*. (emphasis in original). The Policy also establishes that "[i]f an employee has to be away from work for three days or more, due to illness, then the employee will be asked to produce documentation from their physician." *Id*. at 19. Banaszak was aware of both Ten Sixteen's call-off policy and the potential consequences for employees that failed to live up to the requirements. Banaszak Dep. 26–27. As the Policy establishes, the rules contained therein "do not alter the fact that the employee relationship is terminable at the will of either party." Def.'s Mot. Ex. B, at 2.

## C

The morning of Wednesday June 8, 2011, Banaszak was not feeling well. Despite the Policy's call-off procedure, she sent only a text message to her supervisor, Holli Carter, indicating that she was "not well." Banaszak Dep. 55. Although "a call was always expected," *id*. at 54, Banaszak simply decided not to do so, *id*. at 55.

After informing Ms. Carter and Ten Sixteen that she was "not well," Banaszak went to see Dr. Ingram's physician's assistant, William Lorden. Banaszak reported "moderate anxiety-related issues" relating to work pressure and stress, *id*. at 56, and Mr. Lorden advised her to take off of work until June 13, 2011, *see* Def.'s Mot. Ex. C. Mr. Lorden provided a doctor's note indicating his recommendation that Banaszak "remain off of work until 6/13/11." *Id*. Aside from a vague reference to "symptoms & new medications added," the note did not indicate why Banaszak could not return to work. *Id*.

Banaszak assumed Mr. Lorden, or the "nurse at the window," would fax the doctor's note to Ten Sixteen. Banaszak Dep. 59–60. She did not, however, provide a fax number or any other

direction to ensure the note was delivered. Additionally, she did not provide any written authorization allowing the release of her medical records to Holli Carter or Ten Sixteen.[1]

Ms. Carter never received the doctor's note, so she called Banaszak several times on June 8 and 9, 2011. She left messages requesting that Banaszak contact her and provide additional information and a doctor's note. At some point, it is not clear exactly when, Banaszak again texted Ms. Carter, and relayed her doctor's name and phone number, with no other information about her absence. *Id.* at 60.

When Ms. Carter received no adequate responses from Banaszak, nor a copy of the doctor's note, she called again on Friday morning—June 10, 2011. When she again could not reach Banaszak, she left a message advising "specifically that if [she] did not receive a phone call and information from [Banaszak's] physician concerning the time off, by 5:00 p.m., that it would be considered job abandonment." Carter Aff. ¶ 5, *attached as* Def.'s Mot. Ex. D. All to no avail; Banaszak again chose not to return the call. She did not have her boyfriend or her neighbors make a call on her behalf. She did not drive the doctor's note over to Ten Sixteen. Instead, at 4:35 p.m. on Friday, June 10, Banaszak sent another text to Ms. Carter which indicated, "As of today I will be off until July 12th per my doctor for medical reasons." Banaszak Dep. 70. She took no other action to inform Ten Sixteen why she could not return to work or to provide the doctor's note she had received. At no time did Banaszak indicate her absence was related to mental health issues.

Ms. Carter indicated that because "Banaszak never called nor did she provide a doctor's note . . . it was decided that she would be terminated for failing to follow the employee policies and procedures." Carter Aff. ¶ 6. At 6:00 p.m. on June 10, 2011, Ms. Carter made one last

---

[1] Thus, although Banaszak indicates she provided her doctor's number to Ten Sixteen, she does not indicate how Ten Sixteen could have acquired any of her medical information without prior, written approval.

attempt to contact Banaszak. And though Banaszak was available to answer her phone—and knew it was Ms. Carter because of her caller-ID—Banaszak consciously decided not to answer. Banaszak Dep. 70–71.

Subsequently, Banaszak filed this action against Ten Sixteen alleging discrimination under the ADA and interference with her rights under the FMLA. On March 28, 2013, Ten Sixteen moved for summary judgment.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III

Banaszak alleges both violations of the ADA and FMLA. Ten Sixteen argues it is entitled to judgment as a matter of law on both issues. Accordingly, each is addressed below.

### A

Ten Sixteen claims that Banaszak "will be unable to prevail" on her ADA claim. Def.'s Mot. 14. Upon review, Ten Sixteen is correct, and Banaszak's ADA claim will be dismissed.

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Where, as here, the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, she is required "to establish a prima facie case, followed by the familiar *McDonnell Douglas* burden-shifting." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). Thus, the plaintiff first has the burden to establish a *prima facie* case of discrimination under the ADA. If successful, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the termination. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant can satisfy its burden, the plaintiff must show "by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Talley*, 542 F.3d at 1105 (citation omitted). In other words, the plaintiff must supply specific evidence upon which a reasonable factfinder could conclude the termination was based on the claimed discrimination.

To satisfy her *prima facie* case, Banaszak must establish that: (1) she is disabled under the ADA; (2) she is otherwise qualified for the position; (3) she suffered an adverse employment action; (4) Ten Sixteen knew or had reason to know of her disability; and (5) her position remained open or a non-disabled person replaced her. *See Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011).

**1**

Banaszak asserts that she is disabled under the ADA via the "regarded as" prong because she is otherwise qualified for her position, suffered an adverse employment decision, and Ten

Sixteen knew that she was disabled.[2] Banaszak's claim fails, however, because she has not demonstrated she is "disabled" under the "regarded as" prong of the ADA.

To demonstrate disability under the "regarded as" prong of the newly amended ADA,[3] Banaszak must be able to prove that she was subjected to a prohibited action because of an actual or perceived mental or physical impairment. It would be enough that Ten Sixteen took some adverse employment action because of some impairment, whether real or imagined, no matter how insubstantial.[4] *Jennings v. Dow Corning Corp.*, No. 12-12227, 2013 WL 1962333, at *9 (E.D. Mich. May 10, 2013).

Although it is unclear whether Ten Sixteen was aware of the fact, Banaszak was diagnosed with "[m]ajor Depression NOS" and "anxiety" in 2009, and her doctor prescribed

---

[2] Neither party addresses whether the position remained open or a non-disabled replacement was found.

[3] In 2008 Congress enacted the ADA Amendments Act of 2008 (ADAAA), which became effective January 1, 2009. Through the ADAAA, Congress changed the way courts are to review "regarded as" claims under the ADA. Previously, pursuant to the standard established by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), "regarded as" claimants were required to show that their employers believed them to be substantially impaired in a major life activity or unable to work in a broad class of jobs. The ADAAA abrogated *Sutton*. *See Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011).

Under the new regime — the ADA post January 1, 2009 — "regarded as" claimants no longer need to demonstrate that their employer believed them to be substantially limited in a major life activity. Instead, "an individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). "Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the 'regarded as' prong) of this section." 29 C.F.R. § 1630.2(j)(2).

[4] The new ADA creates a puzzle: when a plaintiff brings a claim pursuant to the "regarded as" theory of disability, and the claim is supported by indirect evidence of discrimination, the employer-knowledge element and the adverse-action element of the *prima facie* standard are no longer relevant. This is because to be "regarded as" disabled, an employee must show he or she was subjected to a prohibited action because of an actual or perceived mental or physical impairment. *See* 42 U.S.C. § 12102(2)(A). An employer can only take action "because of" a perceived impairment if the employer is aware of it. Further, once a plaintiff has demonstrated they are disabled via the "regarded as" theory, he or she has already established an adverse action was imposed. Therefore, the long-established five-factor test set forth in *Monette v. Elec. Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996) is rendered obsolete. This five-factor test, when applied to "regarded as" claims supported by indirect evidence, should be consolidated into a three-factor test, requiring a plaintiff to demonstrate the following: (1) the plaintiff suffered an adverse action because of some impairment (whether real or imagined); (2) that he or she is otherwise qualified for the job; and (3) the position remained open or the plaintiff was replaced by non-impaired person.

Wellbutrin. Of course, the Sixth Circuit has previously held that depression is not a disability under the ADA where it can be treated with medication. *See Allen v. BellSouth Telecommunications, Inc.*, 483 F. App'x 197, 200 (6th Cir. 2012); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001) (holding that depression was not a disabling disability where it improved with medication). But Banaszak is not claiming she is actually disabled; only that Ten Sixteen regarded her as such. And under the recast "regarded as" prong of the ADA, Banaszak need not demonstrate actual disability, or even that Ten Sixteen thought she was disabled. She only needs to demonstrate that Ten Sixteen believed she had a "physical or mental impairment." 42 U.S.C. § 12102(3)(A).

But even if Banaszak can show that Ten Sixteen believed she suffered from some impairment, for the "regarded as" prong of the ADA to apply she must also demonstrate that Ten Sixteen subjected her to "an action prohibited under this chapter *because of* an actual or perceived physical or mental impairment." *Id.* (emphasis added). In short, Banaszak must demonstrate Ten Sixteen terminated her "because of" her perceived mental issues. *See Saley v. Caney Fork, LLC*, 886 F. Supp. 2d 837, 853 (M.D. Tenn. 2012) ("the relevant question is whether the employer would have taken the same adverse employment action even if the plaintiff were not disabled.") (citations omitted).

In *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc), the Sixth Circuit assessed what the appropriate standard was for determining whether an employer's adverse employment action was "because of" an employee's disability. *Id.* at 313–14. The court rejected the interpretation of "because of" that would require an employee to show his or her disability was the sole cause of the adverse action. *Id.* at 317. The court also declined to hold that a disability need only be a "motivating factor" in the adverse decision. *Id.* at 321. Instead,

the court concluded that the ADA bars discrimination that is a "'but-for' cause of the employer's adverse decision." *Id.* (quoting *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 176 (2009)).

Therefore, to demonstrate disability pursuant to the "regarded as" prong of the ADA, Banaszak must produce evidence that her perceived impairment was a "but-for cause" of Ten Sixteen's adverse employment action. Put another way, she must demonstrate "that [her] employer would not have terminated [her] in the absence of [her] disability." *Saley*, 886 F. Supp. 2d at 853. This Banaszak has not done.

Ms. Carter—Banaszak's immediate supervisor—established in her affidavit that Banaszak was terminated for failing to follow Ten Sixteen's employee policies and procedures. Carter Aff. ¶ 6. And although Banaszak claims she discussed her psychiatric sessions with Carter, she has produced no evidence that Ten Sixteen knew of her diagnosis and subsequent treatment. As Banaszak testified, during the course of that treatment, she never "provide[d] anything to Ten Sixteen Recovery Network that indicated [she was] suffering from any type of disability."[5] Banaszak Dep. 34.

Finally, in the half-page discussion Banaszak offers to rebut Ten Sixteen's claim that she cannot satisfy her ADA *prima facie* burden, she argues that Ten Sixteen "was aware of [her] disability," that she "was also able to do her job," and that she "was terminated from her job." Pl.'s Resp. 7. Despite these skeletal assertions, nowhere does Banaszak argue that Ten Sixteen terminated her employment *because of* her mental impairments. She claims she "needed to take time off of work because of her mental health issues," *id.*, but omits any connection between her condition and eventual termination. Ten Sixteen, on the other hand, has clearly articulated that Banaszak was fired not because of her mental health, but because she failed to respect company

---

[5] Although Banaszak has provided work evaluations wherein her supervisors noted she was "moody" and "struggles to sustain a positive attitude/mood after recognizing that changes are necessary," she has produced no evidence that Ten Sixteen attributed those issues to impaired mental health.

policy. According to Ten Sixteen, Banaszak would have been dismissed regardless of any impairment.

Simply put, Banaszak's claim cannot succeed where she demonstrates she had an impairment, could otherwise do her job, and was terminated; but makes no indication that her impairment was a "but-for cause" of Ten Sixteen's adverse decision. *See Lewis*, 681 F.3d at 321.

**2**

And even assuming Banaszak could satisfy her *prima facie* burden—by demonstrating a genuine issue of material fact as to whether her mental impairment was a but-for cause of her termination—her case runs afoul of the *McDonnell Douglas* burden-shifting framework.

Noted above, if Banaszak satisfies her *prima facie* burden, Ten Sixteen has the opportunity to "articulate some legitimate, nondiscriminatory reason" for the termination. *Gribcheck*, 245 F.3d at 550. Ten Sixteen has produced ample evidence that Banaszak was terminated not because of any mental health issues, but because she did not comply with Ten Sixteen's employee procedures. *See* Carter Aff. ¶ 6; Def.'s Mot. Ex. B at 18.

Pursuant to *McDonnell Douglas*, Ten Sixteen has satisfied its burden of articulating a non-discriminatory reason for Banaszak's termination. She must now demonstrate "by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Talley*, 542 F.3d at 1105 (citation omitted). And while, for purposes of this section only, it is assumed Banaszak could produce enough evidence to satisfy her *prima facie* burden, she simply has not demonstrated—by a preponderance of the evidence—that Ten Sixteen's stated reason for firing her was mere pretext. What is missing is the causal connection between that termination and Banaszak's impairment—that Ten Sixteen fired her *because of* some impairment. Banaszak has offered little to offset Ten Sixteen's stated reason for her termination; much less a

preponderance of evidence calling the underlying reasons for the termination into question. Her ADA claim will be dismissed.

**B**

Banaszak also claims that Ten Sixteen interfered with her rights under the FMLA when it terminated her in June 2011. *See* Pl.'s Resp. 8. But like her ADA claim, Banaszak's FMLA claim is without merit and will be dismissed.

Pursuant to the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Employers who violate § 2615 are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." § 2617(a)(1).

To sustain her FMLA interference claim, Banaszak must satisfy five elements: (1) that she is an eligible employee; (2) that Ten Sixteen is a qualifying employer; (3) that she was entitled to FMLA leave; (4) that she gave Ten Sixteen notice of her intention to take leave; and (5) that Ten Sixteen denied FMLA benefits to which she was entitled. *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 718 (6th Cir. 2003). Absent direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework also applies to Banaszak's FMLA interference claim if she can satisfy her *prima facie* burden. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (holding that *McDonnell Douglas* applies to FMLA interference claim).

**1**

Banaszak can satisfy the first two elements with little discussion: she was a qualified employee under FMLA, and Ten Sixteen is a qualifying employer. *See* Pl.'s Resp. Ex. I, at 1. Banaszak cannot, however, satisfy every element of her *prima facie* burden.

Banaszak must show that she was entitled to leave under FMLA. An eligible employee is entitled to twelve workweeks of FMLA leave during any twelve month period for one or more of following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter. (B) Because of the placement of a son or daughter with the employee for adoption or foster care. (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition. (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1).

The specific proviso evoked here is § 2612(a)(1)(D), the self-care proviso.[6] Under the self-care section of the FMLA, a plaintiff must demonstrate that she was unable to perform the functions of her position because of a "serious health condition." Such a condition encompasses illness, injury, impairments, or physical or mental conditions that involve either (1) inpatient care in a medical facility, or (2) continuous treatment by the healthcare provider. § 2611(11).

Banaszak asserts that she was receiving continuous treatment because she was incapacitated for more than three consecutive days. Pl.'s Resp. 8; *see also* 29 C.F.R. § 825.115(a). Banaszak neglects to give attention to the language of § 825.115(a), however, which requires more:

> A period of incapacity of more than three consecutive, full calendar days . . . *that also involves*: (1) Treatment two or more times, within 30 days of the first day of incapacity . . . or (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

---

[6] Recently, in *Coleman v. Court of Appeals of Maryland*, 132 S. Ct. 1327, 1332 (2012), the Supreme Court struck down the self-care proviso as applied to state agencies because it abrogated states' sovereign immunity under the Eleventh Amendment. However, at this point, the holding does not extend to cover private employers such as Ten Sixteen.

*Id*. (emphasis added). Banaszak offers no argument that she saw Dr. Ingram "two or more times[] within 30 days of the first day of incapacity." *Id*. But she does assert that she informed Ten Sixteen "that she was under the care of a doctor and that the psychiatrist had at least allegedly taken her off work for a month." Pl.'s Resp. 8. Although Banaszak does not indicate what comprised her "regimen of continuing treatment," she did receive "new medication" from PA Lorden. And "[a] regimen of continuing treatment includes, for example, a course of prescription medication." 29 C.F.R. § 825.113(c). Thus, it is not beyond dispute that Banaszak was entitled to FMLA leave.

But whether Banaszak provided sufficient notice of her intent to take that leave is not so debatable. Banaszak did not provide sufficient notice and her FMLA claim thus fails as a matter of law.

When the need to take leave is unforeseeable, the FMLA provides:

> [A]n employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 C.F.R. § 825.303(a)). Furthermore, an employee "shall provide sufficient information to the employer to reasonably determine whether the FMLA is applicable." 29 C.F.R. § 825.303(b). The applicable regulation does not end there:

> An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying.

*Id*. Merely calling in "sick" without providing "more information will not be sufficient notice to trigger an employer's obligations under the [FMLA]." *Id*; *see also Brenneman v. MedCentral*

*Heath Sys.*, 366 F.3d 412, 425 (6th Cir. 2004) (holding an employee who simply stated that he was "not doing well" did not give the employer enough notice under FMLA); *Woods v. Daimler Chrysler*, 409 F.3d 984, 992 (8th Cir. 2005) (finding employee who delivered two voice-messages to the employer indicating he was going to see a doctor, and then provided a doctor's note that referred only to "evaluation and treatment," was not sufficient to notify the employer that he was requesting FMLA leave). Thus, "the critical question is whether the information imparted to the employer is sufficient to reasonably appraise it of the employee's request to take time off for a serious health condition." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003) (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)).

Both *Brenneman* and *Woods* are applicable to the situation here. Banaszak notified Ten Sixteen on June 8th, 2011 that "she was not well" via text message, Banaszak Dep. 55, using the same language as the plaintiff in *Brenneman*. Although she provided information that her doctor had recommended she take off work, Banaszak, just like the plaintiff in *Woods*, "offered no additional information or substantiation to show [her] absence was because of a serious health condition." *Woods*, 409 F.3d at 992. She only texted her supervisor—Holli Carter—and indicated that she was "tentatively off until June 13th, 2011." Pl.'s Resp. 8.

After receiving Banaszak's text messages, Ms. Carter called her numerous times requesting additional information and a doctor's note. She warned Banaszak that the failure to respond would lead to termination for job abandonment. Banaszak made clear she received Ms. Carter's calls and messages prior to the termination, but made no effort to respond; except to transmit one final text: "As of today I will be off until July 12th per my doctor for medical reasons." Banaszak Dep. 70.

Like the plaintiffs in *Brenneman* and *Woods*, Banaszak did not provide sufficient information to put her employer on notice that she may require FMLA leave for a serious health condition. Moreover, when Ten Sixteen requested additional information, Banaszak neglected her responsibilities under the FMLA, *see* 29 C.F.R. § 825.303(b), and refused to respond. An employee's failure to comply with an employer's request for sufficient information to determine whether the FMLA is applicable is a valid ground for denying FMLA leave. *See id.*

**2**

As before, even if Banaszak could satisfy her FMLA *prima facie* burden, her claim fails under *McDonnell Douglas*. This is because even if Banaszak could satisfy all five elements of her FMLA claim, Ten Sixteen's allegation that it fired her for rejecting the Policy would shift the burden back to Banaszak. At that point, she must demonstrate "by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Talley*, 542 F.3d at 1105; *Donald*, 667 F.3d at 762. Banaszak has not demonstrated, by a preponderance of evidence, that Ten Sixteen's alleged reason for terminating her employment was pretextual. So even if she could succeed with her *prima facie* burden—an unlikely proposition—her claims do not pass muster under the *McDonnell Douglas* burden-shifting framework.

**IV**

Accordingly, it is **ORDERED** that Ten Sixteen's motion for summary judgment, ECF No. 10, is **GRANTED**.

It is further **ORDERED** that Banaszak's complaint, ECF No. 1, is **DISMISSED** with prejudice.

Dated: June 11, 2013                          s/Thomas L. Ludington
                                                                 THOMAS L. LUDINGTON
                                                                 United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 11, 2013.

                        s/Tracy A. Jacobs
                        TRACY A. JACOBS